**SHAFFER v. ARMER et al.**
No. 2833.

United States District Court
D. Kansas, Second Division.
June 20, 1949.

Wayne Coulson, Wichita, Kan., Fleeson, Gooing, Coulson & Kitch, Wichita, Kan., for plaintiff.

Henry V. Gott, Wichita, Kan., Carey, Lilleston, Spradling & Gott, Wichita, Kan., and Thomas A. Slack, Houston, Tex. (Andrews, Kurth, Campbell & Bradley, Houston, Tex., on brief), for defendants.

MELLOTT, District Judge.

This is an action for infringement of a patent. The patent claims a method of joining drill pipe sections to tool joint members by means of a weld laid in a bevel, or counter-bore, cut in the shoulder of a tool joint. The equipment referred to is used in oil well drilling operations. Drill pipe

is customarily manufactured in thirty foot lengths, the most common being about four and one-half inches in diameter. The tool joint is designed to serve as a coupling for drill pipe sections, which, when assembled, produce a "drill-string" or "drill-stem" of indefinite length with a "make-and-break" connection every thirty feet. In the drilling operation the drill string serves in the dual capacity of a drive shaft for turning a rotary bit and as a conduit for the "drilling mud", which is pumped down to the bit under pressure and returned to the surface by being forced up between the outside of the drill string and the inside of the well-hole.

Plaintiff, relying upon all three claims of the patent, prays for an injunction, an accounting of profits and damages, a declaratory judgment holding the patent valid and infringed, and for costs. Defendants seek a declaratory judgment holding the patent to be invalid and not infringed, a permanent injunction against the plaintiff and for an accounting and costs.

Ernest J. Shaffer, the original plaintiff, died since the case was tried and Dan W. Shaffer, administrator c. t. a. of his estate, was substituted as plaintiff. On February 25, 1949, Dan W. Shaffer was formally discharged as administrator and, upon motion, Dora Shaffer, a widow of the deceased, was substituted as plaintiff. References throughout the findings and opinion to plaintiff refer to Ernest J. Shaffer unless otherwise indicated.

Hughes Tool Co., the principal defendant, is accused of manufacturing and selling a tool joint with a counterbored shoulder, which, when welded, results in an infringement. M. B. Armer is charged with purchasing and using "Hughes Counter Bore Tool Joints", welded to drill pipe sections in such a manner as to constitute an infringement.

The record is voluminous. Learned counsel for both sides, however, have been very helpful to the court in suggesting the findings to be made, in making intelligent use of the Rules of Civil Procedure and in filing well-prepared briefs. It is a matter of regret by the court that the pressure of other work has resulted in considerable delay in getting the case decided.

## Findings of Fact.

1. Plaintiff, at the time of trial and prior thereto, was a citizen of the United States and a resident of Tulsa, Oklahoma. Defendant M. B. Armer is a resident of Wichita, Kansas. Defendant Huges Tool Co. is a corporation organized and existing under and by virtue of the laws of the State of Delaware and has a legal and established place of business in Hutchinson, Kansas. (Tr. 33 and 35.)[1]

2. On August 13, 1940, United States Letters Patent No. 2,211,173 was issued to Ernest J. Shaffer. The patent relates to welding of an integrally tapered and threaded tool joint member to a complementary, externally tapered and threaded drill pipe section by laying a ring of weld metal in a bevel or counterbore cut in the shoulder or lip of the tool joint beyond the threaded area and extending substantially to the "last engaged thread." On the pin, or upper member of the tool joint the weld is tapered, forming an oblique shoulder to allow the drill string to pass obstructions when being extracted from the well. On the box, or lower member, the weld is formed to a radial or flat lower surface, thus furnishing means for holding a clamp during raising and lowering operations. (Pl.Ex. 19 and 27.

3. The three claims of the patent, all of which are relied upon by plaintiff, are as follows:

"1. In a pipe joint comprising complementary tapered pin and box members in tight threaded engagement with each other, whereby the box member exerts a compressive stress on said pin member along the zone of such threaded engagement, a ring of weld metal surrounding and joined to said pin and box members and extending from the end of said zone of threaded en-

---

[1] The references to exhibits, pages of the transcript, etc., shown in parentheses following some of the findings, merely indicate part of the evidence upon which the finding has been based. No effort has been made to make the citations complete or to refer to all of the evidence bearing upon any particular finding.

gagement, said ring tightly engaging said pin member to exert a compressive stress thereon for preventing the localization of vibration at the end thread beginning at the end of said zone of said threaded engagement, and with said box member to produce a continuous zone of compressive stress in said pin member bridging the end of said threaded engagement and avoiding a too abrupt change in compressive stress on said pin member at the end of said threaded engagement.

"2. In a pipe joint comprising a pair of tubular members having complemental tapered threaded parts in engagement with each other, whereby a compressive stress is exerted on the inner member along the zone of threaded engagement, means integrally joining said parts together in such manner as to exert a compressive stress on said inner member for preventing the localization of vibration at the end thread over a zone beginning substantially at one extremity of said threaded engagement and extending away from said threaded engagement.

"3. In a pipe joint comprising a tapered externally threaded part and a tapered internally threaded part in threaded engagement therewith whereby a compressive stress is exerted on said externally threaded part along the zone of such threaded engagement, the internally threaded part having a portion overlying and extending beyond said zone of engagement, and means integrally joining said last mentioned portion of said internally threaded part to said externally threaded part in such manner as to exert a compressive stress thereon for preventing the localization of vibration at the end thread over a zone beginning at the end of said threaded engagement and extending away from said threaded engagement."

4. Plaintiff, during a period of convalescence in the early months of 1936, prepared a paper denominated "Improved Conventional Type Tool Joint For All Makes of API Drill Pipe" in which he explained his proposed improvement for welding tool joint members to drill pipes and its advantages over the prevailing method. Attached to the paper were drawings depicting his conception of a counterbore weld tool joint. Another paper termed a "Proof of Conception"—misplaced and not produced at the trial—was prepared by plaintiff, to be signed by all parties to whom he should explain his improvement. In the spring of 1936 plaintiff exhibited these papers and explained his claimed improvement to two representatives of the defendant Hughes Tool Co., viz., Prentis Seale and Sylvester Lintzenich, each of whom signed the "Proof of Conception." Shortly thereafter plaintiff caused several tool joints to be counterbored and welded according to his specifications and tested them in drilling operations for a period of about a year. (Tr. 77-94, Pl.Ex. 19, 20, 21, 23 and 26.)

5. On or about February 28, 1938, plaintiff and Reed Roller Bit Co. of Houston, Texas, entered into a contract under the terms of which the latter was granted non-exclusive license or "shop rights" to plaintiff's improvement and the right to license its use to others, the consideration or royalty to be shared equally. Reed Roller Bit Co. was to bear the full expense of patenting the improvement. (Pl.Ex.25.) On or about June 6, 1938, Reed Roller Bit Co., through its attorneys, applied for a patent in the name of Ernest J. Shaffer. (Deft. Ex.J.) Beginning about 1941 and continuing to the time of trial Reed Roller Bit Co. manufactured, sold and offered for sale, allegedly under the Shaffer patent and the license granted by the contract, a counterbore tool joint called the "Reed 'Threadweld' Tool Joint." (Tr. 95-97, Pl.Ex. 25, 29, 30, 31 and 47.)

6. The patent in suit was granted only after extended proceedings in the Patent Office, including three rejections—the last of which was made final—and an interview with the Primary Examiner. In all, seventeen claims were submitted and all but three were rejected. The three claims finally allowed were limited to "a pipe joint" with complementary tapered threads, with means integrally joining the members at the end of the zone of threaded engagement and extending away therefrom, amended to include the phrase "for preventing the localization of vibration at the end thread." The claims not allowed were rejected pri-

marily on the ground that they were anticipated in earlier patents to Mixer, Spencer, Brantly, and Dillon, and that anything not shown in the earlier patents was an obvious modification of those teachings and the result of mechanical skill. (Pl.Ex. 27 and Deft.Ex.J.)

7. A normal and proper weld laid in a counterbore cut in accordance with the teachings of Shaffer would penetrate substantially to the bottom of the counterbore and substantially to the area of the last engaged thread. (Tr. 199, 200, 323, Pl.Ex. 19 and 27.)

8. The use of the rotary drill and "drill-string" or "drill-stem", heretofore briefly alluded to, has developed largely during the past fifty years. (Pl.Ex. 16.) Prior to about 1933 tool joint members were not customarily welded to drill pipe sections, the practice being to rely upon the union resulting from screwing the tapered and threaded pipes tightly to the tool joints. Since about 1933 a weld has generally been used after the pipes have been "bucked on" —i. e. screwed together tightly with a machine. (Tr. 297–300, Pl.Ex. 16.) The weld customarily used—referred to in the evidence as the "conventional weld"—was accomplished by building a heavy multiple bead weld upon the shoulder of the tool joint and around the outer surface of the drill pipe, extending along the drill pipe approximately five-eights of an inch. The space between the outer side of the pipe and the inner face of the tool joint shoulder being just sufficient to provide thread relief space, very little, if any, of the weld metal penetrated into it. (Tr. 45–47, 60, 65–67, 71 and 207–208.) The gap between the last engaged thread and the foot of the "conventional weld" is considerably greater than the gap occurring between the last engaged thread and the foot of a counterbored weld; and, in some cases, the foot of a conventional weld is removed as much as an inch from the last engaged thread. (Tr. 373, Pl.Ex. 29, 30, and 31.)

9. The term "last engaged thread" as used in the Shaffer patent and in the art generally, refers to the last thread notch of the drill pipe or tool joint which forms a union with a complementary thread peak of the opposite member. It is the thread at which the tight, threaded engagement of the drill pipe to the tool joint ends. 50–51 and 297.)

10. The accused device, the "Hughes Counter Bore Tool Joint", may be described generally and nontechnically as a tool joint with elongated shoulders designed to accommodate a counterbore weld; a convex or curved counterbore cut into the shoulder extending to within approximately one-half inch of the last engaged thread; and beginning at this point and extending down to the threaded area a narrow beveled counterbore is cut. The result may be described as a single counterbore with first a convex and then a beveled profile, extending substantially to the last engaged thread of the tool joint and drill pipe. (Tr. 322, 323, 390.)

11. A normal and proper weld laid in a "Hughes Counter Bore Tool Joint" will penetrate to within approximately one-sixteenth to one-thirty-second of an inch of the foot of the beveled counterbore and substantially to the last engaged thread. (Tr. 200–211, 239–246, 253–258, 323, 328, 348–349, 352, 354, 390–398, 421–428, 434–435, 441, Pl. Ex. 1, 1-A, 32, 42, 64, 65, 67, 70, and Deft. Ex. T-1 to T-6, inc.)

12. Beginning late in 1937 or early in 1938, and within one year next preceding plaintiff's application for the patent in suit, the defendant Hughes Tool Co., at its plant in Houston, Texas, manufactured, welded, sold, and offered for sale the alleged infringing device, and sold and offered for sale through its other legal and established places of business, particularly its legal and established place of business in Hutchinson, Kansas, the alleged infringing device, all prior to the institution of this suit and within six years next preceding, and continued to do so during the time of trial. (Tr. 94, 95, 319, Pl. Ex. 32, 47, 56, 63, 64, 65, 66, 67 and 70.)

13. During the spring of 1936 the defendant Hughes Tool Co. through its officers and agents, Prentiss Seale and Sylvester Lintizenich, acquired knowledge of plaintiff's proposed improvement in tool joints, and announced itself willing to counterbore tool joints for plaintiff, accord-

ing to his specifications. (Tr. 84–86, 88–90, 93–94, 415–417.)

14. Beginning in the fall of 1937 and continuing to the time of trial, defendant Hughes Tool Co., through its agents, had notice of plaintiff's claim that defendant was pirating plaintiff's proposed improvement in tool joints. (Tr. 94–95, 171–173, 416, and 418.)

15. Beginning on or about August 13, 1940, the date United States Letters Patent 2,211,173 issued to plaintiff, and continuing to the time of trial, defendant Hughes Tool Co. had notice of plaintiff's claim of infringement by it of said letters patent. (Pl. Ex. 47.)

16. On November 6, 1937 there was filed in the Patent Office an application for a patent for "Improvement in Means for Protecting Tool Joints" by Gordon W. Woods and Richard Stephen Grant (employees of Hughes Tool Co.) as assignors to Hughes Tool Co. The application was abandoned after final rejection on April 13, 1939, and the examiner's letter of June 6, 1939. The abandoned application claimed a counterbore weld tool joint similar in appearance and specification to the teachings of Shaffer. Typical of the eight claims made in the application for patent was number seven, which reads as follows:

"A drill stem section, a tapered end threaded to engage a tool joint, a tool joint member of hard wear-resisting steel screwed upon said threaded end and having an approximately cylindrical area projecting beyond said threaded end and spaced slightly from the outer surface of said section, the end of said tool joint member being flared outwardly beyond said smooth area to form a channel between said member and said section, and a bond of welding material filling said channel extending into said member about said cylindrical area and securing the inner portion of said tool joint end integrally with said pipe and taking lateral stresses from said threaded areas." (Pl.Ex. 69, Paper No. 4a.)

17. The defendant, Armer, purchased and used in Barton County, Kansas, prior to the institution of this suit and within six years next preceding, a welded string of pipe and tool joints manufactured by the Hughes Tool Co. and of the design alleged to constitute an infringement of plaintiff's patent. (Tr. 26–34 and Pl. Ex. 13.)

18. Letters Patent to Mixer and De La Vergne, No. 220,407 of 1879 (cited in the Patent Office proceeding), discloses a pipe coupling internally threaded at each end with a sleeve of larger internal diameter extending out beyond the threaded area. The cavity formed between the sleeve and the pipe, when in threaded engagement with the coupling, extends from the threaded area to the shoulder of the coupling. The teachings of Mixer do not contemplate a welded joint, but rather that the cavity be filled with soldering or amalgamating metal to form a seal where "absolutely tight joints are required for holding liquids and gases." (Deft. Ex. B.)

19. The patent to Spencer, British No. 280,544, granted August 19, 1926 (also cited by the Patent Office) discloses a method of coupling pipes whereby the ends of the pipes are thickened and one is belled out to form a socket to receive the other pipe end, or a coupling may be fitted to receive both ends, and a sealing weld is laid on the exterior of one pipe and around the beveled edge of the overlapping pipe end or coupling. The pipes may be threaded to draw them together before welding, or a clamp may be used if desired. "The object of our [the] invention is to provide a sound and easily weldable joint which will be durable under pressure and heat." (Deft. Ex. F.)

20. Kane, Patent No. 1,966,348 of July 10, 1934 (not cited by the Patent Office) relates to the coupling of casing pipes in wellholes. The casing sections are provided with complementary bell and spigot ends. The patent discloses a weld laid on the exterior of the spigot end of one casing section and around the beveled, or "under cut", edge of the overlapping bell of the complementary section. Threaded engagement of the casing sections is not contemplated. (Deft. Ex. A.)

21. Dunn, patent No. 2,206,166 issued July 2, 1940 (not cited by the Patent Office) also relates to the coupling of casing pipes in wellholes. The patent discloses an externally threaded casing section with a

raised shoulder beginning a considerable distance above the threaded area, and a socket or internally threaded casing section with a raised shoulder of the same outside diameter, the lip of which extends a substantial distance above the threaded area. The threads on both members are fashioned to allow only their sides to engage. A conventional weld is laid some distance above the area of threaded engagement and filling the gap formed between the two raised shoulders when the casing sections are engaged. (Deft. Ex. I.)

22. The teachings of Mixer, Spencer, Kane, and Dunn are in the art of constructing pipe joints designed to conduct and hold fluids or gases and do not deal with the problems presented in the art of constructing tool joints designed to act as a drive shaft for the transmission of power as well as a conduit for fluids under extreme pressure. (References in the four next preceding findings.)

23. Prior art patent to Brantly, No. 2,073,093 of March 9, 1937 (cited in the Patent Office Proceeding) relates to tool joints similar to those in suit. The sole object of the teachings of Brantly is to eliminate the notch effect in the threaded area of the drillpipe by employing curved or sine wave threads rather than the customary V-shaped thread. Welding of the joint is optional, and the weld contemplated is of the conventional type, which does not fill the thread relief space normally provided. (Deft. Ex. C. L. M. and P.)

24. The teachings of Dillon, Prior art patent No. 2,087,185 of July 13, 1937 (also cited by the Patent Office) relate to tool joints similar to those in suit and contemplate sealing of the joint against washouts by use of a metal packing gasket and the introduction of low melting point metal between the threads of the tool joint and the pipe through an aperture cut in the side of the tool joint leading to annular rings or longitudinal grooves interposed in the threads of the pin or box member to conduct the molten metal around the threads, thus forming a seal or bond to prevent leakage through the threads and vibration or creeping in the threaded joints. It is provided that the conventional weld may be employed at the ends of the joints to lock the pipe sections to the joints, if desired. (Deft. Ex. G.)

25. Flagg, prior art patent, No. 2,145,168 of January 24, 1939 (not cited in the Patent Office proceeding) relates to tool joints similar to those in suit. The patent provides for a tool joint connection wherein the threaded surfaces of the drill pipe and tool joint member are bonded together by heating and coating them with a low melting point brazing metal and engaging the threads while the brazing metal is still in molten form. No actual weld or special counterbore is contemplated or claimed. (Deft. Ex. H.)

26. The fact that the "conventional weld" was metallurgically unsound to the extent that it tended to overheat the pipe during the welding operation and thus cause crystallization; the notch effect in the last engaged thread resulting from flexure of the rotating drill pipe; and the mandrel effect of tapered threads resulting in a concentration of compressive stresses at the last engaged thread were well known to the art prior to plaintiff's conception of the counterbore weld tool joint. (Pl. Ex. 16.)

27. The fact that an increase in deep well drilling through rock formations, reduced drilling weights, lighter drilling muds, higher rotative speeds, and other minor factors, would lead to failures in the vicinity of the last engaged thread of conventionally welded pipe was recognized by the art as early as 1935. (Pl. Ex. 16.) As the result of increased adoption of new techniques in the drilling operation, failures in the last engaged thread increased, and became the subject of considerable discussion in the industry about 1936. (Tr. 48–55.)

28. Sometime prior to plaintiff's conception of the counterbore weld tool joint the "Pittsburg Special Drill Pipe" and "Protin (double grip) Tool Joint" were perfected and placed upon the market. A general and non-technical description of this device is: A drill pipe section with a precision machined upset end and a tool joint with a precision machined, elongated shoulder designed to fit tightly around the drill pipe directly above the threaded area. The "Pittsburg Special", like the counterbore weld

tool joint, was designed to eliminate failures in the vicinity of the last engaged thread by supporting the drill pipe with the tool joint shoulder immediately above the threaded area. (Tr. 79–80, Pl. Ex. 19 and 21.)

29. The adoption by plaintiff of the counterbore weld as a method of supporting the drill pipe down to the threaded area was merely the result of the exercise of ordinary mechanical skill by one trained in the art.

## Conclusions of Law

1. Shaffer patent No. 2,211,173, including claims 1, 2 and 3 therein, is invalid.

2. Plaintiff is not entitled to an injunction, an accounting of profits and damages, or a declaratory judgment holding the letters patent in suit valid and infringed. Defendants are entitled to a general judgment in their favor; but their prayer for additional relief cannot be granted.

## Opinion

The principal defendant, Hughes Tool Co.,[2] is alleged to have infringed plaintiff's patent by manufacturing and selling its counterbored weld tool joints. Upon trial and submission of briefs the issues emerging were: Infringement, validity of patent and laches. More specifically defendants contend: (1) That plaintiff's patent, if valid, has not been infringed; (2) that the patent is invalid by reason of anticipation; (3) that it is invalid for lack of invention; and (4) that, even if valid and infringed, plaintiff's laches prevents the granting of any relief. The second and third contentions will be considered first. Cf. Sinclair Co. v. Interchemical Corp., 325 U.S. 327, 65 S.Ct. 1143, 89 L.Ed. 1644.

In support of their claim of invalidity by reason of anticipation defendants have introduced seven patents, all of which have been briefly described in the findings. It is, of course, fundamental that, constructively, a patentee has before him all prior patents in the art at the time his invention enters. Matthews Corporation v. Alliance Securities Co., 8 Cir., 40 F.2d 879. Several of the patents referred to were considered by the examiners in passing upon plaintiff's application. As indicated in finding No. 6,

they rejected the application several times, the last rejection holding that the three claims—essentially the same as the ones quoted in the findings—were "not patentably distinguishing over any of Dillon, Spencer or Brantly" and as "not patentably distinguishing over Mixer in view of Dillon, Spencer or Brantly." Since the patent was ultimately granted it is presumed to be valid. Mumm v. Decker & Sons, 301 U.S. 168, 57 S.Ct. 675, 81 L.Ed. 983. The presumption falls, however, where the evidence discloses nothing more than the work of a mechanic skilled in the art. Cuno Corp. v. Automatic Devices Corp., 314 U.S. 84, 62 S.Ct. 37, 86 L.Ed. 58.

Of the seven patents cited only three, Brantly, Dillon and Flagg, seem to be strictly within the prior art. Mixer, Spencer, Kane and Dunn seem to be in the art of conventional pipe coupling. The first group presents the lesser difficulty. None of them claims the application of a weld in a special counterbore. Flagg and Dillon disclose primarily a sealing of the joints against washouts by leading or a similar process. Brantly's appears to have been a combination of sine-wave threads and the conventional weld. It is impossible to read any of them upon the device in suit.

Disposition of the second group of patents presents a more difficult problem. Spencer and Kane disclose a weld laid around a simple beveled, or undercut, shoulder rather than a deep, convex counterbore consciously designed to extend substantially to the area of the last engaged thread for the purpose of strengthening that area. Dunn teaches a weld laid in the gap between two raised pipe shoulders. Mixer discloses a simple soldered, or leaded, sleeve joint. None of them deals specifically with the problem of building a drive shaft to transmit power to a rotary drill over a great distance without benefit of journal bearings.

"* * * whether arts or uses are analogous depends upon the similarity of their elements and purposes. If the elements and purposes in one art are related and similar to those in another art, and because and by reason of that relation and similarity make an appeal to the mind of a

---

[2] Hereinafter Hughes.

person having mechanical skill and knowledge of the purposes of the other art, then * * * such arts must be said to be analogous, and, if the converse is true, they are nonanalogous arts." A. J. Deer Co. v. U. S. Slicing Mach. Co., 7 Cir., 21 F.2d 812, 813. Cf. Radiator Specialty Co. v. Buhot, 3 Cir., 39 F.2d 373; Matthews Corporation v. Alliance Securities Co., supra; Alemite Mfg. Corp. v. Rogers Products Co., 3 Cir., 42 F.2d 648; Copeman Laboratories Co. v. General Plastics Corp., 7 Cir., 149 F.2d 962; Superior Separator Co. v. Ottawa Steel Products Inc., 10 Cir. 1949, 174 F.2d 483.

■ Applying the test suggested above the court is of the opinion that the arts are not truly analogous. The cited patents, without more, would not have given Shaffer "what he wished" Skelly Oil Co. v. Universal Oil Products Co., 3 Cir., 31 F.2d 427, 431; and they should not now be aggregated and distorted in the light of after events to have disclosed a counterbored, weld tool joint, extending to the last engaged thread. Hall v. Keller, D.C., 80 F.Supp. 763; Williams Iron Works Co. v. Hughes Tool Co., 10 Cir., 109 F.2d 500.

But while the four patents under consideration do not actually anticipate Shaffer they, and others (including Brantly, Dillon and Flagg), do point up that the principle of joining two pieces of metal by a weld laid in a counterbore is very old and well understood; that its use is not limited to any one art; that it is efficacious to furnish rigidity in a joint as well as to make it leak proof; and that it would be obvious to any craftsman, familiar with the process, that such a weld would provide a flush joint, with a maximum surface area covered, by the use of a relatively small deposit of weld metal. Cf. In re Scherl, 33 C.C.P.A., Patents, 1193, 156 F.2d 72; Keszthelyi v. Doheny Stone Drill Co., 9 Cir., 59 F.2d 3.

■ Deciding whether an alleged invention is the product of inventive genius or mere mechanical skill in the art is usually a very difficult task. Cf. Lincoln Engineering Co. v. Stewart-Warner Corp., 303 U.S. 545, 58 S.Ct. 662, 82 L.Ed. 1008; Cuno Engineering Corp. v. Automatic Devices Corp., supra; Jungersen v. Ostby & Barton Co., 335 U.S. 560, 69 S.Ct. 599, 93 L.Ed. ——. That is especially true where, as here, there is no contention that the patent in suit is basic, pioneer, or generic. The so-called "flash of genius" rule has been subjected to much criticism;[3] and there is now pending in the Congress legislation[4] which would require the validity of patents to be "determined objectively by the nature of the contribution to the advancement of the art." Whether the solution suggested is meritorious, and whether it, or any legislation, would accomplish the end sought is outside the scope of this decision. The rule is firmly established that mere mechanical skill—"display of the expected skill of the calling; * * * the exercise of the ordinary faculties of reasoning, aided by the special knowledge and the facility of manipulation which is acquired through habitual and intelligent practice of the art" is "in no sense the creative work of that inventive faculty which it is the purpose of the constitution and the patent laws to encourage and reward." Callison v. Dean, 10 Cir., 70 F.2d 55, 58. Shaffer, in this court's studied judgment, merely applied mechanical skill when he caused joints being used by him in the oil fields to be counterbored so that a weld might be laid in the fashion shown by this record and in his alleged patent. That is not invention.

But decision in this case need not rest solely upon "lack of invention." The same result ensues, albeit by a more belabored process, when "anticipation" is explored fully.

The rotary system of drilling wells was introduced about the turn of the century. Low-carbon, lap-welded line pipe couplings made up the drill stem for the comparatively shallow-hole, soft-earth operations of that day. About 1910 a rather simple "machine" steel, nonheat treated, tool joint began to replace the pipe coupling which had proved too delicate for anything but the most ideal

---

[3] See e. g. the articles appearing in the April and June issues American Bar Association Journal, Vol. 35, p. 306 et seq.; p. 480 et seq.

[4] H. R. 4798.

drilling conditions. More expanded drilling operations brought on the use of tapered threads and in 1918 the Acme form of thread was introduced. When the use of tool joints became general, defects in the pipe became more obvious. The practice of upsetting the pipe ends was adopted to replace the metal lost in threading. Rounded threads were adopted. When still deeper wells became necessary, pierced seamless tubing replaced the lap-welded line pipe. A further increase in deep well drilling and expansion of the industry to areas of more consolidated earth formations brought on an increase in the carbon content of the drill pipe and tool joint metal, and heat-treating was adopted. This resulted in a stronger, more ductile, drill stem.

In an effort to form a tighter joint, less subject to galling and "mud" leaks, threaded joints were "bucked up" as tight as possible, preferably, by machine. Following this, the conventional weld was adopted, which sealed off the threaded juncture of the pipe and tool joint from mud and corrosive mediums, and, to a great extent, absorbed the complicated combination of stresses concentrated at the last engaged thread. But the industry discovered that straighter holes could be drilled by the adoption of lighter drilling weights and higher rotative speeds. Deep well drilling through rock formations was on the increase. Every effort was being made to speed up the drilling operation. Lighter drilling muds came into use. These factors made deficiencies in the conventionally welded tool joint apparent. The application of a large, multiple bead weld was expensive and wasteful, the heat built up in laying the weld had a deleterious effect upon the heat treated pipe, and, because the weld failed to support the pipe in the general region of the threaded area, it failed to alleviate completely the concentration of compressive stresses and the notch effect at that point. As a result, where more rigorous drilling conditions were encountered, failures in the region of the weld and the thread area occurred.

Apparently, the ever expanding industry called forth from the art many attempts to improve upon the conventionally welded tool joint, of which Shaffer's is but one. The prior art patents, previously discussed —Flagg, Brantly, and Dillon, filed in 1935 and 1936—disclose three such attempts; but there were others. "Pittsburg Special Drill Pipe" and "Protin (double grip) Tool Joint", about this time, made their appearance. All of them, but especially the latter, represented attempts to solve the problem of failure in the vicinity of the last engaged thread by providing precision machined drill pipe and tool joint shoulder designed to fit tightly together from the end of the tool joint shoulder to the threaded area, and, in that way, to allow the tool joint shoulder to join with, and support, the drill pipe immediately adjacent to the threaded area. Although this device appears to have been successful in protecting the last engaged thread and to have enjoyed some commercial success, it had the disadvantage of being a rather expensive remedy, and the tool joints were not easily reworked in the field. Late in 1936 Reed Roller Bit Co. placed on the market the "Shrink-Grip" tool joint. This tool joint was also successful in minimizing fracture in the area of the last engaged thread by joining the drill pipe to the tool joint shoulder immediately above the threaded area which, as the name implies, was accomplished by shrinking the tool joint shoulder around the drill pipe. Although there is no direct evidence on the point, this device was apparently perfected about the time plaintiff began using a counterbore. This same principle of protecting the last engaged thread by joining the drill pipe to the tool joint shoulder immediately above the threaded area was adopted by Shaffer in his counterbore weld. Indeed, it appears to the court that the only substantial difference between the three types of tool joints consisted in the method employed in applying this basic principle; one by precision tooling, one by shrinking, and one by welding.

From what has been said it is apparent that both the problem and the method of solution—supporting the drill pipe down to the threaded area—were known to the art. Actually, the only novelty in plaintiff's counterbored weld, if any, resides in an implicit realization that such a weld, the general effect of which has been known for many years, would serve essentially the same purpose as a precision machined tool joint and

drill pipe or the utilization of shrinking. His own words, shown in the margin,[5] taken from the explanatory paper prepared by him at the time of his alleged conception, tend to establish this fact.

█ The substitution of one known mechanical device (here a counterbore weld) for another mechanical device already in use (precision machined joint and pipe) to perform a similar function in a similar way is not invention. Cf. Keszthelyi v. Doheny Stone Drill Co., supra.

The court has reached the conclusion that plaintiff's patent is invalid both for lack of invention and by reason of anticipation. Whether infringement has been shown, although not necessary to be determined now, would be a very difficult question. Manifestly, plaintiff's patent is not for a conventional tool joint; neither does it purport to give him a monopoly on the use of a counterbore. If this court has erred in determining the patent to be invalid, it seems that infringement could result only from the use of a counterbore precisely like that employed by Shaffer. He sought a joint "in which there will be no substantial gap between the threaded connection and the welded connection", the weld to be placed "in such a manner that it will extend from substantially the last thread of the threaded connection." Defendants contend that they do not extend their counterbore weld down to the last engaged thread. In fact their expert witnesses espoused the theory that the drill stem is stronger if there is a gap between the weld and the threaded connection. Some of the literature, advertising matter and diagrams put out by the defendants seem to belie this assertion; but the question may be passed without decision. So, also, is passed the question whether plaintiff's action should be dismissed for laches. The defendants, however, have not established any right to affirmative relief.

Journal entry of judgment should be prepared by counsel for the prevailing party. Settle in accordance with the Federal Rules of Civil Procedure, 28 U.S.C.A., and this court's Rules of Practice.

---

[5] (Copied as shown.) "Some manufacturers of Tool Joints also Pipes Mills have gone to expensive methods to overcome this difficulty of pipe breaking off as indicated Exhibit D,* the special pipe and Tool Joint Exhibit D, is more expensive and cannot be reworked in feild shops where as the improved type or present can be reworked. The reason Exhibit D cannot be reworked, it is highly precision and that class of work is not available in our present shops. This Improved Type Joint in its simple way and method of installation has all of the features added in the special type Exhibit D, and should add untold wear and life to drill pipe and Tool Joints with no added cost in manufacturer and little add to the purchaser in the field. Welding excluded." (Pl. Ex. 19.) (* A circular of the Pittsburg Steel Co. depicting the "Special" drill pipe and "Protin" tool joint was attached.)