**RUSSELL v. J. P. SEEBURG CORPORATION.**

**No. 7550.**

Circuit Court of Appeals, Seventh Circuit.
Nov. 8, 1941.

Rehearing Denied Dec. 10, 1941.

Casper W. Ooms and Callard Livingston, both of Chicago, Ill., for appellant.

Albert G. McCaleb, of Chicago, Ill. (Robert H. Wendt, J. David Dickinson, and John F. Eakins, all of Chicago, Ill., of counsel), for appellee.

Before EVANS, MAJOR, and MINTON, Circuit Judges.

EVANS, Circuit Judge.

This appeal deals with a patent on an electric apparatus which is used in connection with a "coin-controlled electric shooting gallery" in which the bullets are flashes of light directed by a light rifle at a light sensitive target which actuates an electrical hit-signal means when the marksman's aim is true.

Of the main apparatus, the coin-controlled electrical shooting gallery, little need be said, save that so-called basic patents owned by defendant covered it, and no dispute between the parties exists as to the apparatus or the scope or validity of the patents covering it. The controversy here is over another apparatus which is used in connection with such coin-controlled electrical shooting gallery, and for the purpose of preventing its fraudulent operation. This patent does not pretend to cover the coin-controlled electric shooting gallery.

Briefly stated, the facts showing the development of this phase of the shooting gallery industry, are:

510

Shooting galleries where a man shot at a moving object were old in 1935 when defendant began ("pioneered in," it says) its work in electric shooting galleries. Well known was the game which the operator of a shooting gallery offers to the public in amusement parks, county fairs, and other like places, and where, for a consideration, the marksman may endeavor to hit a moving object. Business, in this industry, was greatly enhanced by the appearance of defendant's galleries, in which, instead of shooting bullets, the marksman shot flashes of light at a light-sensitive target. Defendant states its sales up to January, 1937, were large,—12,000 machines, for which it received $371,000. Defendant's machine, known as "Duck Game Rayolites," was succeeded by another machine called "A Chicken Sam." In a short time, sales of this machine reached nearly a million and a half dollars. This machine too became obsolete when the public tired of tramp targets. The moving object in the first machine was a flying duck and in the second machine, a tramp, supposedly a chicken thief, was used. His movements were determined by the success or failure of the marksman as he shot the light bullets at a light sensitive spot in the moving tramp's shoulder.

Shortly after the appearance of the first electric shooting galleries, it was discovered that flashlights could be used to which the light sensitive target responded. The need of coins was avoided, and the profits of the game were thus either lost or diminished. Those who resorted to this practice were, in the trade and by the witnesses in the court below, called "wise guys." It was to prevent their interference with the legitimate revenues of the business that plaintiff's assignor labored and brought forth his alleged invention. This inventor was Nathen E. Squire. He filed his original application, April 17, 1936. Upon a divisional application filed October 9, 1936, the patent in suit issued, January 23, 1940, and bears the number, 2,187,989. Squire assigned his application to Ford Amusement Devices, Inc. It ultimately passed to plaintiff.

In another patent suit begun in 1935, involving an electric rifle game, the Squire invention, which was used on one of the exhibits, was disclosed. One of defendant's customers, Eggers, in the year 1936, claimed to have conceived and built a fraud preventive circuit, allegedly without the knowledge of the Squire apparatus, but somewhat like it. In 1937, Eggers filed an application for a patent on his apparatus. He later assigned this application to defendant's attorney. An interference was declared with Squire, and a trial had which resulted in a victory for Squire, who was found to be the first inventor. Subsequently Squire's application was favorably passed upon, and the patent in question issued.

In the specifications Squire asserts:

"One of the objects of this invention is the provision of means for preventing the operation of the target releasing mechanism including an electrical relay by the use of a beam of light from a source other than that of the gun of the shooting gallery."

Claims 8 and 11 read as follows:

"8. In an electric shoot gallery of the type having a light gun and trigger means operable to effect emission of light from said gun together with photo-cell target mechanism operable by light from said gun, a control circuit comprising: a photo-cell relay operable by said photo-cell target device, electrically operable indicating mechanism and a supervisory actuating relay therefor, said supervisory relay being connected in circuit with said photo-cell relay and a trigger switch operated by said trigger means on said gun such that the simultaneous operation of said trigger switch means and photo-cell relay will energize said supervisory relay and actuate said indicating mechanism."

"11. A gun game comprising a target, a gun adapted to be aimed at the target, trigger mechanism therein, electrical means associated with the target for indicating a hit, means normally rendering said electrical means incapable of actuation by extraneous stimuli, and means controlled by said trigger mechanism for rendering said electrical means capable of actuation to indicate a hit."

The defenses are: Invalidity; non-infringement; and lack of proof establishing title to patent in the plaintiff.

The last two defenses are hardly worthy of serious consideration. Defendant is highly hypercritical in presenting the last defense.

■ The abstract of title to the patent showed:

(a) · Application by Squire;

·(b) Assignment by Squire to Ford Amusement Devices, Inc.

(c) Assignment by Ford Amusement Devices, Inc. to Callard Livingston.

(d) Assignment from Callard Livingston to John A. Russell, plaintiff herein.

The defense is based upon the alleged failure to show proper acknowledgment to the said assignments by the proper parties. Further objection is made by defendant to the reception of the evidence bearing on acknowledgment as part of plaintiff's rebuttal, instead of part of its proof in chief. The District Court observed at the close of the trial, "The evidence shows title in the plaintiff."

We agree with Judge Sullivan, and reject defendant's urge that part of plaintiff's proof came in its rebuttal and should therefore be eliminated from our consideration.

*Non-Infringement.* In the course of the trial, plaintiff, to make out its prima facie case, offered (a) the patent, (b) defendant's accused apparatus, (c) an exhibit showing a simplified diagram of the fraud preventive circuit in suit, (d) a publication apparently by defendant in which defendant's apparatus was shown and described and its circuit connections disclosed, and (e) also an exhibit which was a reproduction of defendant's circuit found on designated pages of what purported to be defendant's publication. It then rested.

Defendant asserts that it did not stipulate that its service manual and parts' price list *correctly* described its fraud preventive circuit, appearing in its "Chicken Sam" apparatus, Plaintiff's Exhibit 5.

The position of defendant's counsel demonstrates the need of pre-trial conference. There is too much dispute where there should have been none, too much misunderstanding or asserted differences as to the accused apparatus, where facts are not in dispute.

When the exhibit purporting to be defendant's device was offered and received in evidence, it was defendant's duty to speak up and repudiate it as a true description of its parts, including defendant's accused circuit connection. Plaintiff had a right to rely upon defendant's published catalogue and to assume that it correctly described parts of the apparatus which it sold to purchasers of its machine and to purchasers of new parts if a part originally furnished broke down, wore out, or for any reason required replacement. If the catalogue descriptions were incorrect, the burden was on it to show wherein the differences between Plaintiff's Exhibit 5 (Chicken Sam) and the catalogue description of said vital part, existed. Moreover, we are satisfied that there was no misdescription, and the asserted failure to tie up the undisputed fact by stipulation was, in this case, quite inconsequential. Defendant's reliance on these defenses, as well as other positions by it taken, suggest a reluctance to meet plaintiff on the merits of the case.

We have examined the defendant's machine and are convinced, as above stated, that defendant's "parts' price list" did not describe a fraud preventive circuit made by another manufacturer, but described defendant's "Chicken Sam," which it was selling to prospective buyers. Moreover, we have also approached this issue of infringement without this exhibit (Defendant's catalogue describing the parts in question), and we cannot escape a finding of infringement. Defendant's "Chicken Sam" (Exhibit 5 in this case) infringed both claims 8 and 11.

This brings us to the issue which presents the only real controversy in the suit.

*Validity.* Defendant labors under a serious handicap in supporting its defense of invalidity. Its former action opposes its present position. Back in 1937, when the question of validity was entirely open, defendant endeavored to get a patent on an apparatus like plaintiff's. The similarity is shown by the fact that the Patent Office declared an interference, and each applicant (Squire and Eggers) sought the identical claim which was characteristic of their asserted inventions. Eggers' invention and his patent application were acquired by defendant. It may even be fairly inferred that defendant found Eggers and caused him to file the application before defendant's attorney had it assigned to him. A reading of Eggers' testimony fails to awaken confidence in the belief that Eggers at any time invented what was claimed in his application. But passing that fact, the question naturally arises,—If the invention lacked patentable novelty, why did defendant acquire it? If a patent on the invention were invalid, why get into an interference with Squire over it? Why engage in expensive interference over who was entitled to a void patent? If there were validity to this claim in 1938, when did the claim cease to evidence patentable novelty?

512

True, it must be conceded that there is a field, a twilight zone, where legitimate doubt exists and uncertainty, arising from such doubt, justifies the taking of an equivocal position and even the institution of litigation to maintain said position. In a lucrative field of industry, covered and protected by patents, the occupant, enjoying rich returns on his investment, may well look with misgivings on every improvement (or change) in structure which threatens his domination of said business. Moneys are thus paid and positions taken as insurance against uncertainties in a somewhat uncertain venture, to-wit, patent litigation. (In the interest of candor, be it said that the outcome of patent litigation can not be forecast with scientific exactitude.)

In the instant case, however, we could more readily reconcile defendant's effort to acquire an improvement patent of doubtful validity with its present asserted position that the improvement patent is invalid for want of patentable novelty, than we are able to reconcile its present asserted position with its previous claim to ownership of a rival application, to an interference contest in the Patent Office, and its asserted, subsequent discovery that both, its as well as Squire's invention, were, after all, at all times invalid and that the product of Squire's and Eggers' efforts, evidenced mechanical skill only.

Likewise, we are not impressed by the argument advanced by defendant that there were several other electricians who solved, in a manner quite like Squire, the fraudulent operations of the shooting galleries by the "wise guys," who used flashlights. None of these electricians was Squire's contemporary in this field. They produced only after the Squire apparatus was on the market. They came later. In litigation involving another patent, the Squire apparatus was shown in court. Its purpose and its mechanism were then made public. Moreover, their practices were not Squire's, nor are they found in "Chicken Sam."

While the production of mechanisms of like character for a certain purpose, by several people acting independently of each other, and unknown to each other, may evidence lack of inventive qualities and mark the efforts of all as merely mechanical skill, it is here significant that plaintiff's apparatus was in public use and available to the world when the other electricians allegedly produced their structures. The burden was on defendant to show they acted independently of the teachings of Squire.

However, the validity of this patent can not be made to rest upon defendant's action or by its unintended tribute to the originality and the patentable novelty of the combination claims before us. The public is interested. The test of validity must be more rigid, more exacting than the admission of any party, especially the admissions of one who hoped he would be acclaimed the owner of the applied for, but unissued, patent on said invention.

Rather persuasive evidence of the validity of the Squire patent is to be found in the testimony of defendant's engineer.

The first machine, the Flying Duck machine, called the Rayolite, was not equipped with a fraud preventive means. Its misuse was soon observed. Defendant's witness said:

"Well, when the machine was just standing idle, without that pair of blades, somebody could shine a light on it and actually run up the score. But they couldn't do it with that pair of blades. They couldn't do it unless they dropped in a nickel."

After plaintiff's fraud preventive means (or their equivalent) were supplied, the witness testified:

"There was a change made in it sometime around January, 1937 * * * the addition of a pair of shorting contacts that would short out the output of the amplifier."

There was "added a pair of contacts to the machine," added "on the assembly on the main panel," "the panel that controls the operation of the machine." The effect was, "It put the hit signal out of commission; that is what it did." "It was out of commission, except the trigger was pulled." "The addition of another pair of contacts put the hit signal out of commission when the trigger was not operating."

If we were permitted to judge of the inventive novelty of the Squire apparatus as an ordinary layman, we would promptly and unhesitatingly award him the title of inventor. But the test is a higher one than this. We must view and appraise his work from the viewpoint of an electrician,—of one skilled in the electrician's art. We are to place ourselves so far as possible in that imaginary position. Even from that exalted chair, it still looks to us as though Squire made an invention upon which he was entitled to a patent.

We are confirmed in this impression by the action of the Patent Office, which not once, but four times, passed directly or indirectly on the validity of the Squire invention. Not without some hesitation, but yet in the conviction that the weight of the evidence supports this conviction, do we find the patent valid.

The decree is reversed with directions to proceed in accordance with the views herein expressed.