## MAYRATH v. HUTCHINSON MFG. CO. et al.

### No. KC–5

United States District Court.
D. Kansas.

Sept. 29, 1950.

Thos. E. Scofield, Kansas City, Mo., for plaintiff.

Wesley E. Brown (of Martindell, Carey, Brown & Brabets), Hutchinson, Kan., and

Ralph L. Chappell (of Kenyon & Kenyon), New York City, for defendants.

MELLOTT, Chief Judge.

This is an action for infringement of a patent. The patent claims an improved, portable, fluent material loader, consisting of a screw conveyor and supporting and operating structure therefor, whereby material, such as grains, may be removed from freight cars, piles, and the like, to storage containers, trucks, or cars. Plaintiff, relying upon five claims of the patent, prays for a permanent injunction prohibiting the making, sale or use by defendants of a device alleged to infringe, for an accounting of profits and damages, and for costs and attorney's fees. The alleged acts of infringement were committed in this district prior to the filing of the complaint and this court has jurisdiction. 28 U.S.C.A. § 1338(a).

### Findings of Fact

1. Plaintiff, Martin Mayrath, at the time of trial and prior thereto, was a citizen of the United States and a resident of Dodge City, Kansas. Defendant Hutchinson Manufacturing Company, a partnership composed of Harold E. and Albert J. Goetz, has a legal and established place of business in Hutchinson, Kansas, where it manufactures and sells the grain loaders complained of. Robert Goetz, the father of Harold and Albert, owns and operates a farm near Dodge City, Kansas, where he employs and uses a grain loader manufactured by the defendant partnership.

2. On September 27, 1949, United States Letters Patent No. 2,483,290 was issued to plaintiff for a grain loader and, since the issuance thereof, plaintiff has been, and still is, the owner thereof. Loaders covered by the patent are being manufactured by the Mayrath Machinery Company, Inc., a Kansas corporation, in Dodge City, Kansas.

3. The patent in suit contains thirteen claims. The five hereinafter set out are alleged to have been infringed and are assailed by defendants as being invalid:

Claim 2. "A loader for fluent material comprising a screw conveyor and its hous-

ing tube, a wheeled frame having a vertical post, a sleeve pivotally secured to the housing tube and slidably mounted on the post, and a motor unit on the sleeve operably connected with the screw."

Claim 4. "A loader for fluent material comprising a screw conveyor and its housing tube, a wheeled frame having a vertical post, a sleeve pivotally secured to the housing tube and slidably mounted on the post, a motor supporting frame on the sleeve and a motor unit slidably mounted on the motor supporting frame and operably connected with the screw."

Claim 5. "A loader for fluent material comprising a screw conveyor and its housing tube, a wheeled frame having a vertical post, a sleeve pivotally secured to the housing tube and slidably mounted on the post, and a motor unit on the sleeve operably connected with the screw, said connection including a belt and pulley drive and idler wheels positioned tangentially of the pitch circles of the drive and driven pulleys."

Claim 6. "A loader for fluent material comprising a screw conveyor and its housing tube, a wheeled frame having a vertical post, a sleeve pivotally secured to the housing tube and slidably mounted on the post, a motor supporting frame on the sleeve, a motor unit on the motor supporting frame slidably mounted thereon and operably connected with the screw, said connection including a belt and pulley drive and idler wheels positioned tangentially of the pitch circles of the drive and driven pulleys."

Claim 10. "A grain loader comprising a wheeled framework having a vertical post, a sleeve slidably encompassing said post for vertical movement therealong, a stub axle extending laterally from said sleeve, a feed screw housing pivoted on said axle, a feed screw in said housing, and a motor mount secured to said sleeve and extending laterally therefrom in a direction opposite to that of said axle, said motor mount comprising a pair of spaced arms, a pair of parallel guide rods extending between said arms, and motor mounting elements slidably engaging said guide rods."

4. Plaintiff was born and raised on a wheat farm near Dodge City, Kansas. In 1939, he became the active manager of a farm and, as such, had charge of moving large quantities of grain. At first he used a chain type conveyor to elevate grain when loading it into bins and trucks; but he found that there were several disadvantages in using that type of loader. It was heavy, had no wheels, and was unhandy to move; grain had to be brought to it and shovelled into a hopper; the capacity of the loader was small; it moved grain slowly; and, the conveyor chain, composed of many moving links, increased the possibility of breakdowns. After managing the farm about two years, plaintiff began to explore the possibility of securing a more efficient method of moving and elevating grain. He began experimenting with auger type grain loaders. (T 37–38).[1]

5. During the latter months of 1943, plaintiff devised his first auger type grain loader. (T 41). There were, however, several basic differences between this loader and the one for which the patent in suit was issued. The first loader had a tubular auger housed within a conveyor tube mounted upon an adjustable stand with the motor positioned at axle level. The motor was operably connected to the conveyor screw through beveled gears at the upper end, the gears receiving power through a belt and pulley drive, one pulley on the shaft of the bevel gearing and an intermediate set of pulleys being located at the pivot point of the auger tube. This loader was mounted on a three-wheeled stand. (T 38; Plf.'s Exs. 7, 9, 10, 11, 12 and 13).

6. A second loader was devised and built by plaintiff in November of 1944 which was a slight improvement over the first one. The method of elevating and supporting the tube was altered; the conveyor tube was supported by a vertical post mounted on the forward end of a wheeled frame; the

1. Reference to exhibits and pages of the transcript are explanatory only, and no effort has been made to cite all of the evidence upon which any particular finding is based.

tube was adjustable upon this post; automobile wheels were placed upon the loader for greater portability; and the power was conveyed by a belt and pulley drive, through beveled gears to the auger. The connection with the auger was made at the intake end. (T 41; Plfs's Ex. 8).

7. A third model loader, which was constructed in April of 1945, after plaintiff had entered the machinery business in the fall of 1944, was closer in design to the patented device than were the two previous models. It differed from the first two in that no gears were used in the process of transmitting power to the screw conveyor. The motor was operably connected to the screw by a belt from the drive pulley on the engine shaft to the driven pulley, the latter pulley being attached to the shaft of the screw at the discharge end. The connecting belt passed over a pair of idler pulleys positioned tangentially of the pitch circles of the drive and driven pulleys, the engine being balanced on the machine so that it was easier to lift and move. However, there were several disadvantages in this model. In order to elevate the discharge end, it was necessary to tilt the whole machine; the idler pulleys, due to faulty alignment, would fly off their axles after a little use; and the loader had very little vertical adjustment. (T 47–48). Subsequent to the construction of the third model, but prior to the building of the fourth one, plaintiff made a trip to Colorado, and, while there, saw a Kaesler Loader. Following his return, plaintiff began working on his fourth model.

8. Plaintiff's fourth model loader, which was built in the fall of 1945, is substantially the loader which plaintiff patented and which Mayrath Machinery Co., Inc., is presently manufacturing. ( T 47, 50).

9. After completion of the fourth model and while plaintiff's application for a patent was pending, he began to manufacture grain loaders for the commercial market and during that year, 1945, his company made and sold approximately 200 loaders. During 1946 approximately 2,500 were sold and in each of the years of 1947, 1948 and 1949, approximately 6,000 loaders were produced. (T 61–62, 103). Plaintiff's loaders were, and are, commercially successful. During the years 1947 and 1948 he sold about one-third of all auger type grain loaders manufactured in this country and did about one-half of the total dollar volume business in auger-type loaders. (T 349–351; Plf.'s Ex. 19).

10. The patent in suit was granted only after extended proceedings in the Patent Office, including three rejections and two interviews with the Primary Examiner. In all, twenty claims were submitted, thirteen being finally accepted. The claims not allowed were held unpatentable over Kaesler (hereinafter referred to) in view of Freeman, Wentz, and Adams, (also hereinafter referred to) as a result of Interference No. 83,263 and decision by the Primary Examiner.

11. In 1946 plaintiff was confined to a hospital and his home with a serious illness. (T 62). His plant was destroyed by fire in the fall of 1946, but subsequently he began to rebuild. Later, however, anticipating that he would not be able to carry on his business, plaintiff began negotiations with defendant Robert Goetz and his two sons, Albert and Harold, for the purchase of the Mayrath loader business. During the months of February and March of 1947, before the formation of the defendant partnership, defendants had several discussions with plaintiff relative to purchasing his business. Three meetings were held between the parties (T 157, 188–189, 353) and they discussed plaintiff's patent (T 64); the patent application was examined by Albert Goetz (T 188, 195–196, 214, 354); plaintiff explained where his inventory was located (T 357); he informed defendants of his suppliers and subcontractors who made parts and performed work on the loader (T 395); his methods of manufacturing and the design of the loader were discussed (T 360, 188–189); and the Goetzes were invited to inspect the new Mayrath plant.

12. During the course of the negotiations referred to in the preceding finding, Robert Goetz visited several suppliers or subcontractors who made parts for the Mayrath loader. He was permitted to see the parts and how they were made and the

852

manufacturing operations were explained to him. (T 164, 132–133, 220–221; Affidavits of Hogan, Droste and Curtis). While the negotiations were in progress, Albert and Robert Goetz inspected plaintiff's plant approximately three times and examined the manufacturing processes in operation at that time, which were explained to them. (T 123, 150, 158, 220, 138–141, 119–123; Affidavits of Tom Mayrath, Wilmoth, Thompson and Schafer). The sale of plaintiff's loader business to Albert and Harold Goetz was never consummated.

13. During March or April of 1947, Harold and Albert Goetz decided to manufacture grain augers (T 165, 192), and subsequently, in April of that year, they purchased a plant in Hutchinson for that purpose. (T 192). About May 1, 1947, they began to manufacture grain loaders (T 213), six of which were sold during the remainder of that year. (T 165). They continued producing the alleged infringing devices until the time of trial.

14. In the fall of 1946, Robert Goetz purchased a Mayrath grain loader for use on his farm, where it was accessible for examination by his sons, Albert and Harold. Using it as a model, one of the sons made some preliminary sketches of the loader they contemplated making and marketing. (T 125, 146, 165, 184). Practically no design work was done by the Goetz brothers; but during the ensuing seven months between the drawing of sketches and the commencement of production, five models were built. (T 191, 192). They were largely patterned after the Mayrath loaders. (T 146).

15. So nearly alike are the patented and the accused loaders that a general description of the design and operation of one substantially outlines the design and operation of the other. The loaders are described as follows: they consist of a screw conveyor housed within an elongated conveyor tube, the tube having an intake opening at the lower end and a discharge spout at the upper end; the auger at its lower or intake end is exposed so that when it is pushed into a pile of grain it may pick up the grain and feed it longitudinally the length of the tube to be discharged from the upper end through the discharge spout; the conveyor tube is supported on a pivot or stub axle which extends laterally from one side of a vertically adjustable collar; attached to the opposite side of the slidable collar is the motor mount upon which the motor is mounted; the engine is mounted on the slidable collar in such a position that the axis of the engine shaft is substantially in alignment with the stub axle or pivot which supports the conveyor tube; the engine is slidably attached to its mount so that it may be moved forward or backward as the belt lengthens or shortens due to wear or weather conditions; on the drive shaft of the engine is the drive pulley and it is connected to the driven pulley on the shaft of the screw conveyor at the discharge end by a belt passing over and around a pair of idler pulleys positioned tangentially of the pitch circles of the drive and driven pulleys; the adjustable collar, which supports the conveyor tube and motor, is slidably mounted upon a vertical post which is attached to an axle equipped with ground wheels; and, from a pivotal connection on the conveyor tube, located about half way between the intake end and the stub axle where the conveyor tube is attached to the slidable collar, a radius rod extends and is pivotally attached to the axle. (Ex. P). The Hutchinson loader is manufactured in four different lengths, a sixteen-foot loader which will raise grain to a height of ten feet, a twenty-one-foot loader which raises grain to a height of thirteen feet, a twenty-seven-foot loader which elevates the grain to the height of eighteen feet, and a thirty-three-foot loader which will elevate grain to a height of twenty-one feet. (Ex. 5).

16. Not only is the design of the accused device very similar to that of the patented device, but the manner in which the two devices operate, for all practical purposes, is identical. The major parts of the Hutchinson loader—the helix and its housing, the belt and pulley mechanism, the motor, the motor mount, the slidable collar, and the vertical post and its supporting framework—operate substantially alike and perform the same functions in the same manner as does the plaintiff's loader. The

motor remains approximately level as the conveyor tube is adjusted vertically; the motor is slidably mounted on the motor mount so that it may be horizontally adjusted as the belt stretches or shrinks due to normal wear and weather conditions; the pulley and belt mechanism does not need readjustment after raising or lowering of the conveyor tube; the intake end remains stationary as the angle of the conveyor tube is changed; the center of gravity remains over the wheels, thereby balancing the loader; and, the slidable sleeve is relatively easy to adjust on the vertical post because of the manner in which the tube and motor is mounted on the sleeve. (Ex. P).

17. Minor differences between the two loaders are: the wheeled frame of the Mayrath loader has two radius rods while the Hutchinson loader has but one; the patented loader has spoke wheels and the accused device has disk wheels; plaintiff's device has a chain hoist for vertical adjustment of the conveyor while defendants' device has a wire cable hoist; both devices have Clevis hitches, but are attached to the loaders in different manners; the Mayrath conveyor has rods which extend around the intake end of the auger to form an auger guard while the Hutchinson unit has an auger guard made by a ring attached to the conveyor tube by four rods; the discharge spouts are shaped differently; the pivot points on the conveyor tube where the radius rods are attached are unlike in design; the idler pulleys in relation to the driven pulley and to each other are spaced and positioned somewhat differently; the head plates are not the same shape; the bearing housing on the head plates are not alike; the spacing spools used between the driven pulley and the bearing are of different design but are of the same length; the driven pulleys are the same, both are stock pulleys and use shear pins in their drives; and, there is a slight difference in the designs of the motor mounts, the location of the handles thereon for adjusting the motor being in different locations. (T 169–177; Ex. C). The changes made by the defendants in the construction of the accused Hutchinson loader, which defend-ants claim differentiate from the Mayrath device and patent, are inconsequential.

The Prior Art

18. Dolyniuk, 2,355,711 [1944] (Ex. C), "Portable Grain Loading Elevator," shows an auger type conveyor which can be attached to trucks or other vehicles for the purposes of elevating grain from bins or other retainers and which can be adjusted to meet loading conditions. It consists of a single mount, or platform, for the engine and conveyor tube. The mount is arranged to fit over the sideboards of a truck. The housing tube may be raised and lowered and the loader may be used on trucks of different height without interfering with its operation. The motor drives the screw conveyor by means of a belt drive, the belt extending from the engine along the upper portion of the tube to a driven pulley, which is connected by beveled gears to the screw conveyor. The engine is mounted on the platform, with its drive shaft directly in line with the pivot for the conveyor tube. This patent, although not cited by the Patent Office, is in the class which was searched by the Examiner when considering Mayrath's application.

19. Kaesler, 2,395,410 [1946] (Ex. J, cited by the Patent Office), "Grain Elevator," depicts a screw conveyor type grain loader, comprised of an auger housed within a conveyor tube. The tube is supported by a bracket which is pivotally mounted between U-shaped or forked ends of a vertical post. The post is slidably supported in a vertical sleeve of a tripod stand. Attached to the bracket above the tube is a semicircular engine plate, or arcuate base, upon which the engine is mounted. This permits the manual leveling of the motor after the tube has been vertically adjusted, but does not disturb the belt length connections from the motor to the screw. The motor is operably connected to the auger by a belt from the drive pulley on the engine shaft extending along the upper portion of the conveyor tube to the driven pulley on the auger shaft, the belt passing over a pair of idler pulleys positioned tangentially of the pitch circles of the drive and driven pulleys. (T 240–241, 255–260, 281–283,

288–289, 304–305; Ex. J). The Kaesler patent was considered by the Examiner in Interference No. 83,623.

20. Haiss, 1,790,809 [1931] (Ex. B, not cited by the Patent Office), "Conveyor," describes a portable belt type conveyor. The belt carrying frame or chute is supported on a crossbar. Attached at opposite ends of the crossbar are T-couplings slidably mounted· upon two parallel support posts. The posts are attached to the axle by swivel connections. The axle is provided with ground wheels. Horizontal frame members or radius rods extend from the axle to the lower portion of the conveyor at a point substantially midway between its lower end and its point of pivotal connection to the sleeve. A winch, cable and pulley combination raises and lowers the crossbar, vertically adjusting the conveyor chute. As the conveyor chute is elevated the two support posts tilt backward from the vertical toward the intake end and, as the chute is lowered, the posts tilt forward from the vertical toward the discharge end. The motor is mounted on the chute, vertical adjustment thus being accomplished without involving any change in the belt length. However, the engine tilts with the chute as it is raised or lowered because no provision has been made for the leveling of the motor after there has been a vertical adjustment. (T 242, 287, 297–304).

21. Parker, 1,321,123 [1919] (Ex. L, not cited by the Patent Office), "Portable Conveyor," indicates a portable belt loader for moving rock, coal and similar material, consisting of an endless belt and a housing for the belt. The housing is pivotally mounted on the upper ends of a vertical U-shaped supporting frame, which slides vertically through two collars. The two collars are attached to the axle which is equipped with wheels. Radius rods are provided, extending from the axle to a point substantially midway between the lower end of the conveyor chute and the point of its pivotal connection to its support. The motor is attached to the U-shaped frame so that as the conveyor chute is raised or lowered the motor is also raised or lowered. This eliminates manual adjustment of the chain

drive, which is the connecting mechanism between the drive pulley on the motor shaft and the driven pulley which is centrally connected to the endless belt. The conveyor, while in operation, may be pushed rearwardly into a pile of grain. (T 234–237, 253–255, 283–286, 312–313).

22. Tautz, 2,041,578 [1936] (Ex. M, not cited by the Patent Office), "Drill Press Head," discloses a drill head, slidably supported by a vertical post. The drill press in the drill head is mounted on one side of the post, counterbalanced by the motor, which is on the opposite side of the post. The motor is slidably mounted on the drill head, so that it can be moved along the line of the driving belt toward, or away from, the drill press to adjust for slackness of the belt. The drill head is bored so that it may fit slidably upon the vertical post. A slot is provided leading into the bore, which furnishes a certain amount of resiliency or "give." Crosswise and horizontally projecting through the drill head and slot adjacent to the bore is a tightening bolt and nut. By tightening the nut, the drill head is clamped to the vertical post and thereby secured in a stationary position. (T 232, 290–293).

23. Hedgpeth, 2,176,572 [1939] (Ex. N, not cited by the Patent Office), "Power Driven Tool," shows a drill press head, slidably supported by a vertical post. The drilling mechanism is located on one side of the vertical post while the motor is attached to the drill head on the opposite side. The motor is slidably mounted on the drill head, so that it can be moved along the line of the driving belt toward, or away from, the drilling mechanism, thereby providing for the adjustment of the belt length as the belt stretches or shrinks. Primary adjustment of the drill head is accomplished by means of a bore in the drill head which telescopes over the cylindrical standard or supporting post. The drill head is provided with a slot intersecting the bore so that a bolt and nut assembly can be used to contract the sides of the slot, thereby establishing a clamping relation at the bore for fixing the drill head on the vertical post after it has been moved to the desired location. (T 232–233, 290–293).

24. Koch, 2,370,048 [1945] (Ex. O, not cited by the Patent Office), "Nonchattering Motor Base," discloses an adjustable base upon which a small motor may be mounted. The base is comprised of a pair of parallel, round rods mounted on a pair of transverse shoes, attached at the ends of the rods. Between the shoes and slidably mounted on the parallel rods are two cross pieces. The motor is attached to the cross pieces and may be moved backward and forward upon the parallel rods by turning the screw which extends through one of the shoes and is attached to the adjacent cross piece. A method of stressing the parallel rods is provided for by means of a crossbar attached to the middle of each parallel rod. On one end of the crossbar a set screw is positioned coaxial with the bar and at a right angle to one of the parallel rods. It can be screwed in, thus slightly bowing the parallel rods inward. The bowing of the two parallel rods binds the cross pieces to the rods and prevents them from vibrating against each other and chattering. (T 233, 293-294).

25. Klosterman, 2,332,729 [1943] (Ex. D, not cited by the Patent Office), "Portable Grain Conveyor," depicts a drag or chain conveyor used to transfer grain from a bin to a truck. The conveyor chute is secured to a yoke to which is connected one end of a block and fall. The opposite end of the block and fall is connected to a laterally extending arm formed on the upper end of a post which is removably supported on a truck body by one of the stave brackets of the bed. The motor is adjustably mounted on a hinged platform on top of the chute adjacent its discharge end. The motor must be leveled manually as the inclination of the chute is varied.

26. Lewis, 2,425,681 [1947] (Ex. K, cited by the Patent Office), "Portable Screw Conveyor," indicates an auger type loader. Attached above the conveyor tube adjacent to the discharge and is a rockably mounted platform which permits the manual leveling of the engine as the conveyor tube is raised or lowered. The engine which powers the conveyor is mounted on this platform and is operably connected to the auger by beveled gears which are turned by a belt and pulley. No supporting framework for the conveyor tube is shown in the patent.

27. Rensch, 2,378,658 [1945] (Ex. H, cited by the Patent Office), "Grain Loader," shows a grain loading or unloading conveyor comprised of a tube closed at both ends and having oppositely facing inlet and outlet openings in the body thereof near the ends of the conveyor tube. A cradle in which the motor is mounted is disposed over, and pivoted to, one end of the conveyor tube. A drive shaft passes transversely through the tube and is operatively geared to one end of the screw, the shaft constituting the pivot of the cradle. A belt gearing between the motor and the transverse shaft permits the pivotal movement of the tube and conveyor screw relative to the motor. No method of supporting the conveyor tube is provided for in the patent. (T 237).

28. Adams, 2,390,286 [1945] (Ex. I, cited by the Patent Office), "Portable Elevator," discloses a portable auger grain loader for elevating grain piled at ground level. It is composed of a motor truck chassis, a platform at the rear of the chassis and a means for raising or lowering the platform with respect to the chassis. A scoop is adjustably mounted on the platform and adapted to be adjusted to substantially ground-engaging position when the platform is lowered. A worm conveyor extends transversely of the scoop and is positioned therein, it being adapted to catch up the grain forced into the scoop in a depressed position into a pile of grain on the ground. A riser worm conveyor and tube takes the grain from the transverse worm conveyor, elevates it to the upper or discharge end and deposits it in the desired receptacle.

29. Coon, 2,343,444 [1944] (Ex. F, not cited by the Patent Office), "Loader for Baled Material," depicts a chain or belt type conveyor. The conveyor chute is attached near its discharge end to the upper end of a supporting sleeve which is slidably mounted on a stationary vertical post. The vertical post is attached to a three-wheeled support frame above the front wheel. The intake, or lower end, of the chute is pivotally attached to the rear axle at the back

856

end of the support frame. The motor is mounted on the support frame and is operably connected to the conveyor belt by a belt and pulley arrangement and a chain and sprocket wheel mechanism, the connection being made at the intake end at axle level. (T 231, 289).

30. Liggett, 1,808,237 [1931] (Ex. C, not cited by the Patent Office), "Portable Conveyor," describes a belt conveyor for the handling of bulk or package material. A wheeled axle is positioned beneath the conveyor chute substantially midway its length and connected thereto by forwardly extending rods and by backwardly extending strut bars, both pairs being pivotally connected to the conveyor frame. The conveyor frame is elevated by means of the forwardly extending rods. On the underneath sides of these rods are spaced holes extending longitudinally the length of the rods. Each rod rests upon a star wheel, which projects its points into the spaced holes. The star wheel is turned by means of a manually operated worm and worm wheel mechanism which causes the star wheel to move along the rods, thereby vertically adjusting the conveyor frame. The engine, attached to the underneath side of the conveyor chute, tilts with the conveyor chute as it is raised or lowered.

31. Wentz, 1,471,763 [1923] (Ex. A, cited by the Patent Office), "Elevating and Positioning Machine," discloses a portable drag or belt type conveyor body, a rotatable screw shaft extending longitudinally along and on the underside of the front half of the conveyor chute. A threaded bearing block is carried on the screw shaft and a means of rotating the screw shaft is provided for. Two supporting struts, pivotally connected at their respective ends, are attached to the bearing block and the axle. As the screw shaft is rotated, the bearing block is moved along the screw shaft and against the two supporting struts, thus varying the inclination of the conveyor body. The engine is attached to the under side of the conveyor chute and tilts with the conveyor chute as it is raised or lowered.

## Ultimate Finding

Application for the Mayrath patent in suit was pending at the time preliminary sketches of the accused device were drawn by the members of the defendant partnership and construction of the models was begun; at least one of the defendants (Albert J. Goetz) had examined the application and had actual knowledge of its contents; the other member of the partnership had constructive knowledge of such contents; and many of the details of the manufacture of the loader had been disclosed to both of them by the ultimate patentee in connection with negotiations for the sale of the patent. A loader manufactured and sold by the patentee while the patent was pending was substantially copied by the members of the defendant partnership in making the accused devices. Claims 2, 4, 5, 6 and 10 of the patent in suit are valid and they, and the patent in which they are contained, have been infringed by the defendants Harold E. Goetz and Albert J. Goetz. Infringement of the patent by defendant Robert Goetz has not been established by the evidence and he is entitled to go hence without day.

## Conclusions of Law

1. This court has jurisdiction of the parties and of the subject of the action.

2. Martin Mayrath, the plaintiff, is the owner of Letters Patent No. 2,483,290. The patent is valid.

3. Claims 2, 4, 5, 6 and 10 of the Mayrath patent are valid. The language of each is clear and unambiguous and complies with R.S. § 4888, 35 U.S.C.A. § 33.

4. The device manufactured by the defendant partnership is substantially the same as that shown and described in the patent in suit. Claims 2, 4, 5, 6 and 10 may each be read upon it and each of the several claims is infringed.

5. The defendant partnership, composed of Harold E. Goetz and Albert J. Goetz, committed acts of infringement of the Mayrath Patent No. 2,483,290 by manufacturing and selling, within the jurisdiction of

this court, devices covered by claims 2, 4, 5, 6 and 10 of said patent.

6. Plaintiff is entitled to an injunction against the manufacture, sale and distribution by the defendant partnership of the device complained of. Such injunction shall be prepared by counsel for the prevailing party and submitted to the court. Settle in accordance with the Rules of Federal Procedure, 28 U.S.C.A., and this court's Rules of Practice.

Plaintiff's claim for profits, damages, costs and attorney's fees against the defendant Robert Goetz has not been established and is denied. Order so providing shall be prepared by his counsel. Settle as outlined above.

Plaintiff's claim for profits, damages and attorney's fees, unless agreed upon, will be determined by the court later; and jurisdiction to make such determination is expressly retained by the court.

## Opinion

The findings which have been made and the conclusions which have been reached are dispositive of all issues, save only the amount to be awarded plaintiff for profits, damages, attorney's fees and costs. The preparation of a lengthy opinion seems to be wholly unnecessary.

As indicated in Finding No. 3, plaintiff contends that devices manufactured and sold by the defendants infringe five claims of a patent duly and regularly issued to him while defendants assail those claims as invalid. They also deny that infringement occurred or has been shown.

■ No attempt will be made to summarize the evidence upon which the several findings have been based. Defendants, in support of their contention that the patent is invalid by reason of anticipation, introduced in evidence six patents, all of which have been described in the findings. Two of them were considered by the examiners and, as indicated in Finding No. 10, they thrice rejected the application. However, following personal interviews, the withdrawal of several claims, the modification of others, and as the result of a decision by the Primary Examiner following interference, a patent was finally issued. Presumptively, it is valid;[2] although the presumption may be overcome by clear and convincing proof.[3] An infringer, however, fails to sustain his burden of proof if his evidence is inconclusive and of only dubious preponderance.[4] The presumption falls, of course, where the evidence discloses nothing more than the work of a mechanic skilled in the art;[5] for, as has been said many times, that does not amount to, or constitute, invention.

■ The patent in suit is for a combination. At the trial counsel for the defendant took the position, more fully developed upon brief, that the patentee had done no more than "aggregate a collection of various elements into one unit, * * * [substituting] one mechanical equivalent for another, but * * * [not making] the type of contribution which warrants any attention from the patent system." In support of that view it was shown, for example, that Dolyniuk and Kaesler both showed a screw conveyor and its housing tube, Hais and Parker both showed a wheeled frame having a vertical post, while Klosterman "is of particular interest because it shows that belt or drag conveyors were used interchangeably in the art." Plaintiff responds that defendants have merely selected "parts of the different patents and attempt[ed] to combine them to build up a mosaic pattern that will have the novel features of the structure of the patent in suit,"—a practice which this court understands is not proper under the decided cases. Thus this, the Tenth Circuit, in Williams Iron

2. Mumm v. Decker & Sons, 301 U.S. 168, 57 S.Ct. 675, 81 L.Ed. 983.

3. Crosley Corp. v. Westinghouse Electric & Mfg. Co., 3 Cir., 152 F.2d 895.

4. Williams Mfg. Co. v. United Shoe Mach. Corp., 6 Cir., 121 F.2d 273, affirmed 316 U.S. 364, 62 S.Ct. 1179, 86 L.Ed. 1537;

cf. Philippine Sugar E. D. Co. v. Philippine Islands, 247 U.S. 385, 391, 38 S.Ct. 513, 62 L.Ed. 1177.

5. Cuno Corp. v. Automatic Devices Corp., 314 U.S. 84, 62 S.Ct. 37, 86 L.Ed. 58; Shaffer v. Armer, 10 Cir., 184 F.2d 303, affirming Id., D.C., 84 F.Supp. 613.

858

Works Co. v. Hughes Tool Co.[6] has held that

"In order to anticipate a patent for a combination, a prior patent must disclose all the elements of such combination, or their mechanical equivalents, functioning in substantially the same way to produce substantially the same results."

No such proof has been made in this case. The court, therefore, is unable to find that the patent is invalid by reason of anticipation.

 The question of invention is a more difficult one. As the Court of Appeals for this Circuit recently pointed out in Shaffer v. Armer,[7] " * * * to make sure that a monopoly is not granted for mere perfection of workmanship, the courts closely scrutinize claims to combinations for improvements in a crowded art";[7] and "perfection of workmanship, however much it may increase the convenience, extend the use, or diminish expense, is not patentable", citing Reckendorfer v. Faber, 92 U.S. 347, 356–357, 23 L.Ed. 719 and Cuno Engineering Corp. v. Automatic Devices Corp., 314 U.S. 84, 91, 62 S.Ct. 37, 86 L.Ed. 58. It recognized, however, that "a patent for an improvement which fills a long felt need, and which those schooled in the art have not been able to devise, and which meets with acceptance in the market, ought to have the benefit of the doubt when challenged" by an infringer. The patent in suit, in this court's studied judgment, is in that category. While the "flash of creative genius" is not especially bright, it seems that the patentee's conception is a "substantial innovation" for which society is truly indebted to him; and, if the commercial success from market demand is allowed to tip the scales even slightly in his favor,[8] the court's finding and conclusion that the patent issued to him is valid, seems to be justified.

 Findings numbered 11 through 17, it is believed, show infringement and justify the court in making its ultimate finding on that issue, together with its conclusions thereon. Other evidence, not specifically referred to, supports that view. Thus, although both defendants were in the courtroom during the trial and heard testimony to the effect that Harold had admitted copying the patented device and saying: "We wanted to copy the best one," neither denied such copying or the making of that admission. Several of the parts used in the device manufactured by the defendants were purchased from the same sources which supplied them to plaintiff, and they were attached and used, in some instances, precisely as indicated in the patent. The differences in the two devices were largely inconsequential and the testimony of the defendant who testified with reference to them and how they were designed, was unconvincing. Infringement of the plaintiff's patent has been established. He is therefore entitled to the relief demanded.

---

6. 109 F.2d 500, 506.

7. See footnote 5.

8. Goodyear v. Ray-O-Vac Co., 321 U.S. 275, 64 S.Ct. 593, 88 L.Ed. 721; cf. Faulkner v. Gibbs, 9 Cir., 170 F.2d 34, affirmed per curiam Id., 338 U.S. 267, 70 S.Ct. 25.